UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 04-10221-RWZ |
| | ) | |
| NURIA SOLE, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS
COUNTS THREE THROUGH ELEVEN OF THE INDICTMENT

The United States of America, by its undersigned attorneys, respectfully submits this opposition to defendant Nuria Sole's motion to dismiss Counts Three through Eleven of the Indictment. As grounds for this opposition, the government states the following.

BACKGROUND

A.    Factual Background

This case arises from an investigation of drug trafficking in the greater Boston area.  The government expects its evidence to show that the defendant, Nuria Sole, became a habitual user of methamphetamine while she was employed as a chemist at Applera Corporation in Bedford, Massachusetts.  Largely to obtain methamphetamine for personal use, Sole began assisting two methamphetamine dealers with their respective methamphetamine businesses.  Among other things, Sole used a mass spectrometer at her workplace to analyze methamphetamine samples she obtained from the dealers.  She also helped one of the dealers maintain records of drug sales, amounts owed, and so forth.  (Both of the

methamphetamine dealers who Sole assisted are cooperating with the government and will testify at trial.)

In addition to assisting the two dealers with their respective methamphetamine businesses, Sole provided them with quantities of gamma hydroxybutyric acid or "GHB," gamma butyrolactone or "GBL," and 1,4 butanediol or "BD," in exchange for methamphetamine.  Sole knew that the dealers were consuming these drugs as well as selling them to others.  Indeed, one of the dealers will testify that he sold GBL to others at Sole's apartment with Sole's knowledge and permission.  Sole also provided GHB, GBL and/or BD to others for personal use and resale.  Sole obtained the GBL and BD from her workplace and may also have manufactured it at her apartment.  Records obtained from Applera Corporation show that between December 2002 and February 2004, Sole ordered a total of 33 liquid kilograms of GBL and 21 liters of BD from chemical supply companies.  Applera officials are expected to testify that Sole had no legitimate work-related reason to order those chemicals; that she did so without the company's knowledge, permission, or approval; and that she appears to have stolen quantities of them from the company.  They are also expected to testify that Sole followed none of the labeling, storage, or other procedures required for listed chemicals such as GBL, even though Sole knew about the procedures and used them for other listed chemicals.

On March 10, 2004, agents of the Drug Enforcement
Administration ("DEA") executed a search warrant at Sole's Boston
apartment.  Among the items recovered were small amounts of
methamphetamine, a great deal of laboratory equipment, and
instructions for synthesizing GBL.  Sole was present during the
search and was asked several times whether there were drugs in
the house.  At first she denied it, but then she brought the
agents into the kitchen and pointed to several different
containers of liquid, some of which tested positive for GHB and
BD.  Sole said that she did not know what was in the containers
but that it might be drugs.  The liquid in the containers was
packaged in both single-dose and wholesale amounts.

During the search of Sole's apartment, one of the agents
told her that she would be charged with selling GHB and
methamphetamine.  Sole said that she never got money for GHB and
that she never sold methamphetamine.  One of the agents told Sole
that he thought she had a problem with methamphetamine and
believed that she might have been trading GHB for
methamphetamine; Sole did not deny this but said that she did not
think she had a problem with methamphetamine.  Moments later Sole
said that perhaps she did have a problem and was in denial.

B.   Procedural Background

On July 22, 2004, Sole was charged by indictment with two
counts of conspiracy to distribute, and to possess with intent to

3

distribute, a controlled substance (Counts One and Two); four counts of possession with intent to distribute gamma butyrolactone or "GBL" (Counts Three, Four, Six, and Ten); and five counts of possession with intent to distribute 1,4 butanediol or "BD" (Counts Five, Seven, Eight, Nine and Eleven).

Counts Three through Eleven of the Indictment allege violations of the Controlled Substance Analogue Act ("Analogue Act"), 21 U.S.C. § 813, which makes it a crime to distribute "controlled substance analogues" for human consumption.  The government's evidence will show that although GBL and BD are not themselves controlled substances, they are controlled substance analogues of GHB, which is a controlled substance, and that Sole distributed the GBL and BD to others for human consumption.

Sole has now moved under Federal Rule of Criminal Procedure 12(b)(2) to dismiss Counts Three through Eleven of the indictment on the ground that the Analogue Act's definition of "controlled substance analogue" is unconstitutionally vague.  She has attached an affidavit from a chemist who opines that the chemical structures of GBL and BD are not substantially similar to the chemical structure of GHB, as required by the Act.  She also asserts that she "knows" GBL and BD are not analogues of GHB.

Sole's motion lacks merit and should be denied.  Whether GBL and BD are in fact controlled substance analogues of GHB is a question of fact for the jury; the Analogue Act is

4

unconstitutionally vague only if it defines "controlled substance analogue" so broadly that it results in arbitrary enforcement or fails to provide notice of the proscribed conduct to a person of ordinary intelligence.  That is not the case here for at least three reasons.  First, when the government scheduled GHB as a controlled substance in 2000, it notified the public that it considered GBL and BD to be controlled substance analogues of GHB and that distribution of those chemicals for human consumption could give rise to criminal prosecution under the Analogue Act. Second, the chemical structure and pharmacological effects of GBL and BD are sufficiently similar to those of GHB to put the public on notice that GBL and BD are controlled substance analogues and to prevent arbitrary enforcement of the Analogue Act.  Third, every court of appeals to consider the question has squarely held that the Analogue Act is not void for vagueness as applied to GBL and BD.

**ARGUMENT**

A.    The indictment cannot lawfully be dismissed on the theory that the government will be unable to prove that GBL and BD are "controlled substance analogues."

To the extent Sole bases her motion to dismiss on the theory that GBL and BD are not in fact "controlled substance analogues," the motion is improper.  Whether GBL and BD are controlled substances analogues is a question for the jury.  See <u>United States</u> v. <u>Klecker</u>, 348 F.3d 69, 72 (4th Cir. 2003); <u>United States</u>

5

v. <u>Washam</u>, 312 F.3d 928, 928-29 (8th Cir. 2002); <u>see also</u> United

<u>States</u> v. <u>Roberts</u>, 363 F.3d 118, 125 (2nd Cir. 2004) ("[A] jury

could reasonably find that [BD] . . . easily meets the . . .

definition of 'controlled substance analogue.'").  Rule 12(b)

does not authorize motions to dismiss based on a claim that the

government will be unable to prove its case at trial.  <u>See</u> <u>United</u>

<u>States</u> v. <u>Brown</u>, 481 F.2d 1035, 1041 (8th Cir. 1973) ("There is

no authority under Rule 12 . . . to dismiss on the basis of a

sufficiency-of-the-evidence defense which raises factual

questions.").

> B.   The Analogue Act is not unconstitutionally vague as
>      <u>applied to GBL and BD.</u>

To the extent Sole bases her motion to dismiss on the theory

that the Analogue Act is unconstitutionally vague as applied to

GBL and BD, it lacks merit.  The Supreme Court explained the

modern view of the void-for-vagueness doctrine in <u>Kolender</u> v.

<u>Lawson</u>, 461 U.S. 352 (1983):

> As generally stated, the void-for-vagueness
> doctrine requires that a penal statute define
> the criminal offense with sufficient
> definiteness that ordinary people can
> understand what conduct is prohibited and in
> a manner that does not encourage arbitrary
> and discriminatory enforcement.  Although the
> doctrine focuses both on actual notice to
> citizens and arbitrary enforcement, we have
> recognized recently that the more important
> aspect of vagueness doctrine is not actual
> notice, but the other principal element of
> the doctrine -- the requirement that a
> legislature establish minimal guidelines to
> govern law enforcement.  Where the

> legislature fails to provide such minimal
> guidelines, a criminal statute may permit a
> standardless sweep that allows policemen,
> prosecutors, and juries to pursue their
> personal predilections.

Id. at 357 (internal quotation marks, punctuation, and citations omitted).  The Supreme Court also has held that "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."  United States v. Mazurie, 419 U.S. 544, 550 (1975).

The Analogue Act is not unconstitutionally vague as applied to GBL and BD for several reasons.  First, when the government outlawed GHB in 2000, it expressly notified the public that the distribution of GBL and BD for human consumption could give rise to criminal prosecutions under the Analogue Act; accordingly, there is nothing "arbitrary or discriminatory" about prosecutions which allege that GBL and BD are "controlled substance analogues."  Second, the structural and pharmacological similarities that GBL and BD bear to GHB are so close that any person of ordinary intelligence could determine that GBL and BD are GHB analogues.  Third, every court of appeals to consider the question has held that the Analogue Act is not unconstitutionally vague as applied to GBL and BD.


1.   The government notified the public that the distri-
     bution of GBL and BD for human consumption could give

7

rise to criminal prosecutions under the Analogue Act.

On February 18, 2000, Congress enacted the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act, which directed that GHB be scheduled as a controlled substance. The Act is named after two high school girls who died after apparently being drugged with GHB. GHB facilitates date rape because it is largely colorless, tasteless, and odorless, and, when slipped into a drink, can quickly render a person unconscious or even comatose. Even small amounts of GHB can be fatal, and overdoses are common. In directing that GHB be listed as a Schedule I controlled substance, Congress noted that "law enforcement officials have been experiencing an increased presence of the drug in driving under the influence, sexual assault, and overdose cases, especially at night clubs and parties." Pub. L. 106-172, § 3(a), Feb. 18, 2000, 114 Stat. 8; 21 U.S.C. § 812 note.

When Congress scheduled GHB, it did not likewise schedule GBL and BD, because those are industrial chemicals with legitimate uses; it did, however, expressly find that "common industrial chemicals such as gamma butyrolactone [GBL] and 1,4-butanediol [BD] are swiftly converted by the body into GHB" and that "illicit use of these and other GHB analogues and precursor chemicals is a significant and growing law enforcement problem." Id. Accordingly, Congress regulated the sale of GBL by designating it as a List I chemical, see 21 U.S.C. § 802(34)(X),

8

while simultaneously providing that "[t]he designation of
[GBL] . . . as a listed chemical . . . does not preclude a
finding . . . that the chemical is a controlled substance
analogue," <u>see</u> 21 U.S.C. § 802(32)(B).  The DEA, in amending 21
C.F.R. 1310.02(a) to reflect Congress's designation of GBL as a
List I chemical, published this interpretation of Congress's
action in the Federal Register:

> If taken for human consumption, GBL and other
> chemicals, including [BD], are swiftly converted into
> GHB by the body.  Abuse of these and other GHB-like
> substances is a significant law enforcement and public
> health problem.  GBL and [BD] are structurally and
> pharmacologically similar to GHB and are often
> substituted for GHB.  Under certain circumstances they
> may satisfy the definition of a controlled substance
> analogue.  Congress expressly contemplated this
> possibility by amending 21 U.S.C. 802(32) to state that
> the designation of GBL or any other chemical as a
> Listed chemical does not preclude a finding that the
> chemical is a controlled substance analogue and subject
> to the provisions of 21 U.S.C. 813.

65 Fed. Reg. 21645 (Apr 24, 2000).

In short, when the government outlawed GHB in 2000, it
repeatedly notified the public of its view that GBL and BD are
controlled substance analogues and that the distribution of those
chemicals for human consumption could give rise to criminal
prosecutions under the Analogue Act.  In light of those express
notifications, there can be no merit to the argument that
applying the Analogue Act to GBL and BD encourages "arbitrary and
discriminatory enforcement," which is the chief concern of the
void-for-vagueness doctrine.  <u>Kolender</u>, 461 U.S. at 357.

9

    2.    The structural and pharmacological similarities that GBL and BD bear to GHB put the public on notice that <u>GBL and BD are controlled substance analogues.</u>

The Controlled Substance Analogue Act provides in relevant part:  "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law, as a controlled substance in schedule I."  21 U.S.C. § 813.  As the Fourth Circuit observed in <u>United States</u> v. <u>Klecker</u>, <u>supra</u>, "Congress enacted the Analogue Act to prevent underground chemists from altering illegal drugs in order to create new drugs that are similar to their precursors in effect but are not subject to the restrictions imposed on controlled substances."  348 F.3d. at 70.

The Analogue Act defines a "controlled substance analogue" as a substance--

    (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

    (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

    (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C.A. §  802(32)(A).  Although the "or" at the end of the

10

second paragraph indicates that the entire definition is written in the disjunctive -- i.e. that a controlled substance analogue is a substance that satisfies paragraph one *or* paragraph two *or* paragraph three -- several courts have held instead that a controlled substance analogue must satisfy paragraph one *and* paragraph two or paragraph three, while other courts have found ways to avoid deciding the issue. See <u>United States</u> v. <u>Turcotte</u>, 405 F.3d 515, 521-23 (7th Cir. 2005) (collecting and summarizing all of the cases). The government believes the disjunctive reading is the correct one, but it recognizes that the weight of authority is against it and thus will proceed on the assumption that the Court will adopt a conjunctive reading.

    a.   <u>Substantially similar chemical structure</u>

As set forth in the attached affidavit of Thomas DiBerardino, Ph.D., GBL and BD bear substantial structural similarities to GHB. Indeed, the BD molecule is chemically identical to the GHB molecule except that BD has two hydrogen atoms in a place on the molecule where GHB has a single oxygen atom. Similarly, GBL is identical to GHB except that it lacks a water molecule present in GHB and is in the form of a ring. Dr. DiBerardino further notes that the addition and loss of water molecules is common in molecules such as GBL and can occur spontaneously; thus, GBL and GHB exist in equilibrium and convert from one to the other under ambient circumstances.

Although Sole has submitted an affidavit from J. Thomas Ippoliti, Ph.D., who opines that GBL and BD are not structurally similar to GBH because the atoms with respect to which they differ constitute a functional group of each molecule, Dr. DiBerardino points out that "while functional groups at different positions [on a molecule] may alter certain physiochemical properties [of the molecule] (e.g., solubility, polarity, melting point, etc.), they are not considered in making a determination regarding structural similarity."  Accordingly, any "functional group" differences among the molecules does not render the Act unconstitutionally vague as applied to GBL and BD.

b.    <u>Substantially similar or greater narcotic effect</u>

Since Sole acknowledges (or at least does not contest) that GBL and BD are swiftly converted by the body into GHB, there appears to be no dispute that GBL and BD satisfy the second requirement for being a controlled substance analogue, i.e. that they have a "substantially similar" or "greater" narcotic effect on the body than GHB.  In any event, the government will, if necessary, offer evidence at trial that the narcotic effect of GBL and BD is substantially similar or greater than that of GHB.

3.    Every court of appeals to consider the question has
      held that the Analogue Act is not unconstitutionally

12

vague as applied to GBL and BD.

Every court of appeals decision to address whether the Analog Act is unconstitutionally vague as applied to GBL or BD and has held that it is not. See United States v. Ansaldi, 372 F.3d 118 (2d Cir. 2004) (GBL); United States v. Roberts, supra, 363 F.3d 118 (BD); United States v. Washam, supra, 312 F.3d 928 (BD); United States v. Turcotte, 405 F.3d 515 (7th Cir. 2004) (GBL and BD); United States v. Orchard, 332 F.3d 1133 (8th Cir. 2003) (BD); United States v. Fisher, 289 F.3d 1329 (11th Cir. 2002) (GBL). Generally speaking, these courts reason that the structural and pharmacological similarities among GBL, BD, and GHB, are sufficient to notify the public that the distribution of GBL and BD for human consumption is proscribed by the Analogue Act.

In Roberts, for example, the defendant, like Sole, emphasized that GBL and BD differ by two atoms which correspond to different functional groups, meaning that BD and GHB fall into different categories (alcohol vs. acid), have a different three-dimensional shape, and yield different NMR spectograms. 363 F.3d at 121-22. The government, as here, emphasized the molecules' two-dimensional similarity and offered expert testimony that functional groups concern a molecule's properties and reactivities rather than its chemical structure, which is the characteristic that matters under the Analogue Act. Id. The

13

district court -- which "put great weight on the seeming lack of
consensus among the experts," id. at 126 -- sided with the
defendant, but the Second Circuit reversed.  It held that it is
so "obvious" that BD falls "within the intended meaning of
'controlled substance analogue'" that the disagreement among the
experts was not "relevant."  Id. at 126-27.  It explained:

> Given the combination of GHB's cognizable
> similarity to [BD] prior to ingestion and its
> metabolization into that controlled substance
> after ingestion, the classification of [BD]
> as a controlled substance analogue is clearly
> mandated by the Act's language, and remains
> so regardless of the differences of view
> among the experts.  In short, given the
> circumstances of this case, an evaluation of
> the statute's vagueness as-applied does not
> call for the fine distinctions drawn by the
> experts.  We conclude that the Act's
> definition of 'controlled substance analogue'
> gives the public clear enough warning that
> [BD] qualifies as a controlled substance
> analogue and sufficiently limits
> prosecutorial and judicial discretion in its
> enforcement, and that, therefore, the
> definition of 'controlled substance analogue'
> is not unconstitutionally vague as applied to
> [BD].

Id. at 127.  Accord Washam, 312 F.3d at 931 ("We have held that
all experts need not agree on whether two drugs' chemical
structures are 'substantially similar' in order to affirm a
conviction under the Analogue Statute."); Klecker, 348 F.3d at 72
(noting that the "courts of appeals have unanimously rejected
vagueness challenges to Analogue Act prosecutions" even though
"experts can disagree about whether two molecules have chemical

14

structures that are substantially similar").

In <u>Fisher</u>, <u>supra</u>, the Eleventh Circuit relied on a similar rationale in holding that the Analogue Act is not unconstitutionally vague as applied to GBL.  The court there wrote:

> It is undisputed that . . . upon ingestion, GBL converts into a GBL metabolite: GHB.  Therefore, this Court finds that GBL upon ingestion meets the definition of a controlled substance analogue as its chemical structure and effect on the central nervous system are substantially similar to GHB. . . .  People of ordinary intelligence would easily be able to determine that a substance, which is converted upon ingestion into a metabolite with a substantially similar chemical structure and effect on the central nervous system as a Schedule I controlled substance, would meet the definition of a controlled substance analogue.

289 F.3d at 1339; <u>accord</u> <u>Ansaldi</u>, 372 F.3d at 122 ("Regardless of any other ways in which the laws governing controlled substance might be vague, there is one thing they make perfectly clear -- the sale of GBL for human consumption is illegal.").

4.    Sole's training and employment have no bearing on the vagueness analysis.

Sole's argument that she lacked notice of the illegality of her conduct because, as a trained chemist, she "knows" that GBL and BD are not controlled substance analogues of GHB, betrays a fundamental misunderstanding of the void for vagueness doctrine. If GBL and BD *are not* in fact controlled substance analogues of GHB, then Sole did not violate the Analogue Act; if they *are* controlled substance analogues of GHB, then it is meaningless to

15

say that Sole "knows" they are not.  To prevail on her vagueness
challenge, Sole must start with the premise that GBL and BD *are*
in fact controlled substance analogues of GHB and then show that
the statute provides insufficient notice of that fact or
encourages arbitrary enforcement.  As demonstrated above, she has
not made that showing.

Sole's argument may be nothing more than that, in light of
her training, she *actually believed* during the relevant time
period that the chemical structures of GBL and BD are not
substantially similar to the chemical structure of GHB; even
assuming that was her belief, however, it does not follow that
she lacked notice that GBL and BD are controlled substance
analogues of GHB.  As the Fifth Circuit observed in Washam,
supra, the vagueness "inquiry looks at what a person of 'common
intelligence' would 'reasonably' understand the statute to
proscribe, not what the particular defendant understood the
statute to mean."  312 F.3d at 930-31 (quoting Connally v. Gen.
Constr. Co., 269 U.S. 385, 391 (1926) and United States v. Nat'l
Dairy Prods. Corp., 372 U.S. 29, 32-33 (1963)).  The statute is
not unconstitutionally vague just because Sole misunderstood it,
even assuming that she truly did.

Finally, Sole's argument that she is unfairly being
prosecuted as "an organic chemist who used GBL [and BD] as a
solvent while working in the lab" is a red herring.  Sole has not

16

been charged with -- and the Analogue Act does not prohibit --
the legitimate use of GBL and BD in the laboratory.  Rather, the
indictment charges that Sole possessed GBL and BD with the intent
to distribute it for human consumption.  If the government can
prove -- as it expects to -- that Sole gave GBL and BD to friends
for personal use and traded it to others for methamphetamine with
the expectation that it would be consumed or resold, there is
little chance that she will be the victim of an arbitrary or
discriminatory enforcement of the Analogue Act.  On the contrary,
the distribution for human consumption of narcotic substances
that cannot be scheduled because they have a commercially
legitimate use was one of the chief purposes of the Analogue Act.
See United States v. Hofstatter, 8 F.3d 316, 321-22 (6th Cir.
1993) (holding that the district court correctly held that the
Analogue Act was not void for vagueness even though "the
chemicals in question could be put to legitimate uses").

     WHEREFORE, the government respectfully requests that Sole's
motion to dismiss Counts Three through Eleven of the Indictment
be denied.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:   /s/ William Weinreb
                              WILLIAM D. WEINREB
                              NANCY S. RULE
                              Assistant U.S. Attorneys

                              17